NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**JUDITH D. WALKER,**

        **Plaintiff,**

**-vs-**                                           **Case No. 6:10-cv-396-Orl-22KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

        **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument on the Complaint filed by Judith D. Walker, seeking review of the final decision of the Commissioner of Social Security denying her claim for social security benefits. Doc. No. 1. The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA). Doc. Nos. 4, 5. This matter was referred to me for the issuance of a Report and Recommendation.

**I.**     **PROCEDURAL HISTORY.**

In 2006, Walker applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 *et seq.*, and under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, *et seq.* (sometimes referred to herein as the Act). R. 108, 111, 137. She alleged

that she became disabled on December 1, 2001.  R. 108, 111.  Walker's applications were denied initially and on reconsideration.  R. 74-79.[1]

Walker requested a hearing before an administrative law judge (ALJ), which was held on September 9, 2008, R. 22-72.  Walker, represented by an attorney, testified at the hearing.  R. 25-59, 65-67.  Susanna D. Roche, a vocational expert (VE), also testified.  R. 59-64, 67-71.

After considering the testimony and the medical evidence presented, the ALJ determined that Walker was insured under OASDI through December 31, 2006.  R. 17.  The ALJ found that Walker had not engaged in substantial gainful activity since December 1, 2001, the alleged onset date of her disability.  *Id.*

The ALJ concluded that the medical evidence showed Walker had the following severe impairments: chronic right hand pain and cardiomyopathy.  R. 17.  The ALJ also determined that Walker's impairments did not meet or equal any of the impairments listed in the applicable social security regulations (the Listings).  *Id.*

The ALJ found that Walker had the residual functional capacity (RFC) to perform the full range of light work as defined in 20 C.F.R. 404.1567(b)[2] with a limited fine manipulation skill of feeling.  R. 17.

---

[1] The record is unclear regarding the disposition of Walker's SSI application.  The Court assumes that it was denied.

[2] Light work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567.

In reaching this conclusion, the ALJ gave minimal weight to the findings of Dr. Brian Kelly, Walker's cardiologist, finding that his opinion was not supported by his own treatment notes and that the record did not reflect treatment by Dr. Kelly after October 2006.  R. 20. The ALJ also noted the February 2006 opinion of Dr. George White, a hand surgeon, indicating that Walker would be restricted to permanent light duty, no lifting over 20 pounds, and no repetitive lifting, pushing, or pulling with the right arm.  R. 19.  Nevertheless, the ALJ indicated that he gave significant weight to the opinion of a reviewing physician that Walker would have decreased sensation in the 4-5 fingers of her right hand which causes limited feeling. R. 21.

The ALJ determined that Walker was capable of performing her past relevant work as an electronic assembler. R. 21. The ALJ noted that according to the testimony of the VE, Walker was also able to perform two sedentary unskilled jobs that existed in significant numbers in the national and local economies.  *Id.*  Therefore, the ALJ concluded that Walker was not disabled.  *Id.*

Walker requested review of the ALJ's decision and submitted additional evidence for consideration.  R. 4, 9-11.  On January 29, 2010, the Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 1-4.

Walker timely sought review of this decision by this Court. Doc. No. 1.  Thereafter, the parties filed memoranda of law in support of their positions.  Doc. Nos. 7, 8.

NOT FOR PUBLICATION

## II.     JURISDICTION.

Plaintiff having exhausted her administrative remedies, the Court has jurisdiction to review the decision of the Commissioner pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. § 1383(c)(3).

## III.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   42 U.S.C. §§ 423(d)(3),1382c(a)(3)(D). In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979) (per curiam).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?
>
> (2) Is the claimant's impairment severe?

>   (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?
>
>   (4) Is the claimant unable to perform his or her former occupation?
>
>   (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability. A negative answer leads to a finding of "not disabled." *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform." *Id.* at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (per curiam), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210. "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means

NOT FOR PUBLICATION

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam) (citing *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983)). Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision. *Dyer*, 395 F.3d at 1210. The court may not reweigh the evidence or substitute its own judgment. *Id.*

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988) (per curiam). Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

Case 6:10-cv-00396-ACC-KRS   Document 9   Filed 01/06/11   Page 7 of 18 PageID 81

NOT FOR PUBLICATION

## IV. STATEMENT OF FACTS.

After a thorough review of the record, I find that the facts are adequately stated in the parties' memoranda. Therefore, I will summarize the facts relevant to Walker's assignments of error only in an effort to protect her privacy to the extent possible.

*A.    Walker's Testimony.*

Walker was born in 1947.  R. 25.  She completed school through the eleventh grade and received her GED when she was 50 years old.  R. 26.  She had been assembling electronics for a number of years, starting in 1969.  R. 26.  Walker was injured on the job in 1999 when she fell off a stool onto her arm and right hip.  R. 27.  After the injury, she tried to return to work light duty but could not keep up with the work.  *Id.*  She quit working in December of 2001.  R. 26.

Her last job was as an electronics inspector/tester.  R. 27.  She lifted between 7 and 10 items at a time, each of which weighed 6 pounds.  R. 28.  She used her hands all day long, including repetitive fingering and reaching.  R. 28-29.  She could stand all day or sit all day depending on the type of work she was doing.  R. 29.  It took her years to learn how to perform this job.  *Id.*  She stopped working in 2001 because she could not keep up with the required pace of her work, had pain in her hip, arm, fingers and hands all day long and was depressed.  R. 29-30.  Her job required her to type, which she was no longer able to do due to pain.  R. 34.  She was no longer able to grasp or twist items due to trigger finger and arthritis in her ring finger.  R. 35.

She had had hand, wrist and elbow surgeries.  R. 31-32.  Nevertheless, she had sharp pain like electricity ran through her arm to her head and caused headaches.  R. 31-32.

She could not grasp items with her right hand, and she dropped things. R. 32. She could wash dishes in the dishwasher but had trouble reaching down and picking them up. R. 32-33.

She had an enlarged heart and did not pump sufficient blood out of her heart. R. 42. She became short of breath with exertion and had high blood pressure. R. 43. Her heart problems increased when she was anxious or upset. R. 44. She felt fatigued from her heart condition. R. 48. She had erratic heart beats two or three times per month and took nitroglycerine. R. 49.

Hip pain prevented Walker from sitting much. R. 36. She could stand for 30 minutes at a time. R. 36, 56. It was easier to sit for longer periods of time, about two hours at a time. *Id.* After sitting a long time, she had a hard time getting up. R. 37. She had trouble driving long distances. R. 37. She could walk 200 feet but would then need a break. R. 39. She did not lift anything except her daughter's hairbrush. R. 40.

During the day, when she had hip pain, she would lie on her side and take Advil or aspirin. R. 38. Her 10-year-old daughter helped her with the dishes, and with cleaning and washing. R. 33. Her disabled husband took care of her horses because she was not able to do so. *Id.* She was able to spray the horses for bugs and walk with her husband to feed them. She was no longer able to ride horses due to pain and a fear of falling. R. 33-34.

B.   *Medical Evidence.*

Walker treated with William J. Rogers, Jr., M.D., on January 1, 2000. R. 202. She complained of pain, swelling and dysfunction of her right hand following a work related injury in May of 1999 when she fell off stool and landed on her hand. She had pain and was

unable to extend both fingers fully without discomfort. Dr. Rogers' impression was persistent flexor tenosynovitis of the third and fourth fingers of her right hand. *Id.*

On July 30, 2001, Dr. Rogers performed a trigger finger release on the third and fourth fingers of her right hand. R. 201. Following the surgery, Walker had full extension and flexion of her fingers without pain. R. 199. However, on August 22, 2001, she was having pain on her fourth finger and the flexor tendon sheath was injected. She could extend and flex her finger without pain. She was advised to rest and use ice packs for a couple of days. *Id.*

A note from George White, M.D., indicates that Walker had a follow-up visit on February 9, 2006, but there are no prior notes in the record. R. 203. He noted Walker continued to have aching pain along her elbow. She had mild numbness on her elbow but had good grip, pinch and strength in her right hand. *Id.* He stated that she had reached maximum medical improvement with a 3% whole body impairment due to residual ulnar nerve symptoms. She was returned to permanent light duty with no lifting over 20 pounds and no repetitive lifting, pushing, or pulling with her right arm. *Id.*

Walker was first evaluated by Brian D. Kelly, D.O., a cardiologist, on March 15, 2006. R. 232. She complained of chest pain that came and went. She had pressure on her left chest that radiated down her left arm. She became short of breath, felt tired and had left arm pain. She also had nausea with the pain, and the pain was increasing in frequency. She would become lightheaded and had trouble catching her breath. *Id.* A myoview stress test

showed an ejection fraction of 38%[3], an abnormal exercise electrocardiogram, a physiologic blood pressure response to exercise, no arrhythmias, and poor exercise tolerance. R. 230-31.

On March 24, 2006, she underwent heart catheterization to evaluate her cardiac disease. R. 208-09. Based on the results of the catheterization, she had severe stenosis of the bilateral renal arteries and underwent stenting of those arteries. R. 210-11, 229. Dr. Kelly noted she had nonobstructive coronary artery disease; left ventricular dilation with mild to moderate hypokinesia (diminished activity) with estimated left ventricular ejection fraction in the range of 35% to 40%; 99% left renal artery stenosis with 95% right renal artery stenosis; and 10% stenosis after bilateral renal artery stenting. R. 211.

At a follow up visit on April 5, 2006, Dr. Kelly noted Walker's blood pressure was controlled, and she was cardiac stable. R. 229. On May 16, 2006, Walker complained to Dr. Kelly of chest discomfort, aching in her left arm, and some lightheadedness as well. R. 227. Dr. Kelly's impression was stable cardiac status and continued her on the same treatment plan. Dr. Kelly recommended a Holter monitor to evaluate arrhythmias as a possible cause of her pain. R. 228.

On August 9, 2006, Walker treated with Nitin Haté, M.D. R. 213. She complained of pain in her right arm even after several surgeries on her arm, a carpal tunnel release and a cubital tunnel release. She had shoulder pain as well and had difficulty with heavy lifting.

---

[3] Ejection fraction is a measurement of the percentage of blood being pumped by the heart. A normal ejection fractions is 55% to 70%. Mayo Clinic, *Ejection fraction: What does it measure?*, found online at http://www.mayoclinic.com/health/ejection-fraction/AN00360 (last visited Jan. 5, 2011).

R. 213. She complained of occasional chest pain, which she had several times a day at times. *Id.* Her grip strength was normal. R. 214. She had diminished TPP sensations. Her muscle strength was normal, and there was no muscle atrophy. Her hypertension was not well-controlled despite medication. R. 215. Dr. Haté opined that any limitations on her activities would be secondary to pain. *Id.*

At a follow up visit with Dr. Kelly on October 3, 2006, Walker complained of sudden onset chest pain, which was moderate. Her pain was relieved by nitroglycerine. R. 224. Dr Kelly recommended following up with a nurse practitioner in 3 months and with him in 6 months. R. 226. He prescribed Protonix and Crestor. R. 226.

On January 3, 2007, Walker saw Dr. Kelly's nurse practitioner. R. 197-98, 280-81. Walker denied any chest pain, shortness of breath or swelling. She was having problems with insomnia and depression and cried frequently. R. 198, 280. The practitioner's impression was stable cardiac status and significant depression with insomnia. R. 197, 281. Walker was given samples of all her medications because she indicated she was having difficulty paying for them. *Id.*

On April 4, 2007, Walker saw Dr. Kelly. She denied any chest pain, palpitations or dyspnea. Dr. Kelly's impression was hypertension, and he prescribed an additional medication. R. 196, 279.

On May 17, 2007, Walker treated at the Orlando Medical Center complaining of depression, decreased energy, palpitations and insomnia. R. 286. She was prescribed medications. *Id.* She treated again on June 14, 2007, complaining of stomach upset,

NOT FOR PUBLICATION

decreased mood, and increased anxiety. R. 285. She was prescribed Zoloft and advised to take over the counter Prilosec. *Id.*

On July 3, 2007, Dr. Kelly noted that Walker denied chest pain, palpitations, swelling, or dyspnea. Her blood pressure had been very well controlled for the past few weeks. She was not having any significant problems with anxiety or stress, and he stated she "actually has been doing quite well." R. 192, 277. His impression was stable cardiac status and poor exercise tolerance. R. 192-93, 277-78. He recommended that she walk 10 minutes daily and increase to 30 minutes daily. He would reevaluate her in 3 months. R. 193, 278. She was again given samples of her medications. R. 194.

A letter dictated by the nurse practitioner and signed by Dr. Kelly on July 3, 2007 indicated that Walker had initially been seen in March 2006 for severe cardiomyopathy and a history of severe hypertension that was difficult to control. The note indicated she had a left heart catheterization and had a significantly diminished ejection fraction running around 30%. He stated she frequently had problems with dyspnea with exertion and previously had problems with heart failure although recently she had stabilized on her medications. Her cardiac function had not improved over a year and a half of aggressive treatment and she continued to have a lowered ejection fraction with no significant improvement. He recommended that she was disabled from a cardiac standpoint, and was "Class II to Class III New York Class heart failure." He observed that Walker decompensated with increased stress and anxiety secondary to her hypertension, which aggravated her significant cardiomyopathy. R. 195, 260.

On July 17, 2007, Walker complained to the Orlando Medical Center of lack of sleep and anxiety, with nausea from her medications. R. 284. Her medications were revised. *Id.*

Dr. Kelly continued to treat Walker through at least April 2008. On October 2, 2007, Walker continued to deny any chest pain, palpitations or dyspnea but continued to have poor energy levels. R. 191, 275. On January 7, 2008, Walker did not have chest pain, palpitations, edema or dyspnea. She did have fatigue and nausea for the past 5 months and frequent daily episodes of dizziness. She had two episodes of chest pain which were remedied with nitroglycerin. R. 188, 273. Dr. Kelly's impression was stable cardiac status. R. 190, 274. He changed her medications due to significant nausea and dizziness. Because of her severe complaints of right hip pain, Dr. Kelly sent her for an x-ray. She was given samples of medications. R. 190. On April 1, 2008, Dr. Kelly's impression remained stable cardiac status. She was to continue on her current medications, and would need hip surgery long-term. R. 186, 271. She did not have any episodes of heart pain and no further recommendations were made. R. 189, 272.

*C.    Reviewers.*

On August 17, 2006, Heather L. Avery completed a Physical Residual Functional Capacity Assessment. R. 216-23. Avery opined that Walker could lift 20 pounds occasionally, 10 pounds frequently, and stand and/or walk and sit about 6 hours in an 8 hour workday with unlimited pushing and pulling. R. 217. Avery stated that Walker's symptoms were partially credible based on medical evidence.

On February 7, 2007, Stephen Burge, M.D., completed a Physical Residual Functional Capacity Assessment. R. 252-59. Dr. Burge indicated Walker's primary

diagnosis was right hand pain. R. 252. Burge opined that Walker could lift 20 pounds occasionally, 10 pounds frequently, and sit about 6 hours in an 8 hour workday with unlimited pushing and pulling. R. 253. He noted that Walker had limited feeling due to decreased sensation in her fourth and fifth fingers of her right hand. R. 255.

### D.   *Vocational Expert Testimony.*

At the hearing, the VE testified that Walker's prior employment was as an electronics assembler, DOT No. 726.684-018, a light work position with a skill level of four. R. 61. The electronics inspector job had a skill level of three, and was classified as a light work position by the DOT, but as she performed the job, it was a medium work position. R. 61.

The ALJ posed the following hypothetical question to the VE:

> Assume that I find that she can – we have a person who is closely approaching advanced age as of the alleged onset date. And she turned of advanced age in 2002 when she turned age 55 and now she's closely approaching retirement age, age 60, with a twelfth grade education – eleventh grade, plus a GED, work experience as you have described. Assume that I find that she can lift and/or carry occasionally 20 pounds and frequently 10 pounds, that she can stand and/or walk at least 2 hours in an 8 hour workday, and she can sit for about 6 hours in an 8 hour workday, and push and pull is unlimited. She has restrictions in feeling, which is limited . . . . With these restrictions, would she be able to perform past relevant work?

R. 61-62. Based on this hypothetical, the VE responded that Walker would not be able to perform her past relevant work. R. 62. No further questions were asked regarding Walker's past work.

Based on the above hypothetical, the ALJ also asked whether there were any jobs such a person could perform in the national economy. R. 62. The VE responded that she could perform the job of food and beverage order clerk, DOT No. 209.567-014, which was

a sedentary job with an SVP of 2, an unskilled position. R. 62. She could also perform the job of new account interviewer, DOT No. 205.367-014, which was a sedentary job with an SVP of 2, and unskilled position, as well. R. 62.

The ALJ asked the VE a second hypothetical:

> [S]ame person as in hypothesis number one. Assume that I find that she is restricted to light duty, no lifting over 20 pounds with no repetitive lifting, pushing or pulling with the right arm. Would she be able to perform past relevant work?

The VE responded that she would not be able to perform past relevant work. R. 63. The ALJ then asked if there were any jobs that she would be able to perform with those restrictions, and the VE responded that there were no jobs she could perform. R. 64. The VE further explained that the basis for that determination was because Walker's right arm was her dominant arm and that with the restriction of no repetitive lifting, pushing, and pulling with the right arm, she was unable to determine any jobs Walker could perform. *Id.*

## V. ANALYSIS.

Walker argues that the ALJ erred in determining that she could perform the full range of light duty work with the exception of limitation in the fine manipulation skill of feeling because the ALJ did not afford sufficient weight to the opinion of Walker's treating doctors, Dr. White and Dr. Kelly. Walker also contends that the ALJ erred in finding that Walker could return to her past relevant work and improperly discounted the opinion of the VE. The parties were advised that issues not raised would not be addressed. Doc. No. 6 at 2. Accordingly, I will address these issues only.

*A.    Dr. White's Assessment.*

Although the treatment records for Dr. White are incomplete, it is clear that he was one of Walker's treating physicians. *See* R. 203 (entitled "Established Patient Evaluation"). Dr. White, a hand surgeon, placed Walker on permanent restrictions of no lifting over 20 pounds, without repetitive lifting, pushing or pulling with her right arm. R. 203.

In his opinion, the ALJ acknowledged Dr. White's functional capacity assessment, R. 19. He did not explain, however, why he did not afford that assessment significant weight and, instead, relied on the opinion of the reviewing physician who opined that Walker could perform light work with no limitations other than limited feeling. R. 21.

"The law of this circuit is clear that the testimony of a treating physician must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause has been found where the treating physician's opinion was not bolstered by the evidence, was inconsistent with findings by other physicians or the treating physician's own records, or were merely conclusory. *Id.* "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error." *Id.*

In this case, the ALJ did not articulate any reason for giving little weight to Dr. White's RFC assessment. The Commissioner attempts to fill this lacuna with his explanation why it might have been appropriate for the ALJ not to afford great weight to Dr. White's RFC assessment. *See* Doc. No. 8 at 9-10. However, the Court must evaluate the legal and factual basis of the Commissioner's decision, not reevaluate the evidence anew. "A clear articulation of fact and law is essential to our ability to conduct a review that is both limited

and meaningful." *Owens v. Heckler*, 748 F.2d 1511, 1514-15 (11th Cir. 1984). Therefore, remand is required to permit an adequate articulation of the legal and factual underpinnings of the decision.[4]

### B. Dr. Kelly's Assessment.

The ALJ also gave minimal weight to Dr. Kelly's assessment regarding Walker's limitations due to her heart condition. He based this decision on the lack of indication in Dr. Kelly's treatment notes that Walker had an ejection fraction of 30% or decompensation with increased stress and anxiety. He also noted that the last treatment notes in the file were dated October 2006, which was inconsistent with "such a severe heart condition." R. 20.

The Commissioner concedes that the ALJ's finding that there were no treatment notes from Dr. Kelly after October 2006 is an incorrect statement, because the record contains records of Dr. Kelly's treatment of Walker through April 2008. Doc. No. 8 at 10. The Commissioner argues that the misstatement regarding treatment notes is harmless error because the later treatment notes did not show that Walker had functional limitations that undermine the ALJ's RFC determination.

Because the case should be remanded for other reasons, as discussed above, the Court need not consider whether the ALJ's incorrect statement about Dr. Kelly's treatment notes is harmless. On remand, the Commissioner should again evaluate the file as a whole, including any supplemental or relevant additional evidence submitted by Walker, and state

---

[4] Because the functional capacity of Walker's right hand and arm is crucial to the VE's testimony regarding the work Walker could perform, it is not clear on the present record that Walker is disabled. Accordingly, remand for further proceedings is required. Therefore, the Court need not address Walker's arguments about transferability of skills and application of the Medical-Vocational Guidelines.

NOT FOR PUBLICATION

adequate reasons supported by evidence in the record to support the final conclusion. It would be of assistance to the Court in any future decision if the Commissioner would explain the disposition of the SSI application and provide the documents showing such disposition.

## VI. RECOMMENDATION.

For the reasons set forth herein, it is **RESPECTFULLY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that the case be **REMANDED** to the Commissioner for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). It is also recommended that the Clerk of Court be directed to issue a judgment consistent with this Order and, thereafter, to close the file.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended this 6th day of January 2011.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Presiding District Judge
Counsel of Record